R. W. Carver et al., Appellees, v. Paul Brien, Individually, and Chairman Local Protective Board Local No. 346, et al., Appellants.

Gen. No. 42,028.

Heard in the third division of this court for the first district at the October term, 1941. Opinion filed July 3, 1942. Rehearing denied September 18, 1942.

Frank L. Mulholland, Clarence M. Mulholland and Willard H. McEwen, all of Toledo, Ohio, for appellants.

Bull & Rugen, of Chicago, for appellees; Follett W. Bull and Richard C. Rugen, both of Chicago, of counsel.

Mr. Justice Hebel delivered the opinion of the court.

This is an appeal from a decree in chancery entered in the circuit court of Cook county, Illinois, upon the report of a master in chancery, in an action for specific performance of a contract dated August 22, 1934. The action arose out of a complaint filed by certain employees of the Chicago & Alton Railroad Company, hereinafter referred to as the "Alton," in their own behalf and on behalf of other persons similarly situated, against the Brotherhood Railway Carmen of America, certain local lodges affiliated with this Brotherhood and certain persons who were made parties defendant, both individually and as lodge officials.

The case was referred to a master, who issued a report making certain findings of fact and recommending a decree in favor of plaintiffs. Objections were filed to this report by defendants and were overruled. The objections so overruled were ordered to stand as exceptions. The court below then overruled said exceptions and entered a decree confirming the master's report, both as to facts found by the master and conclusions of law recommended. The decree in substance provided: (1) That plaintiffs (originally employees of the Baltimore & Ohio Railroad Company prior to 1931, but who were employed by the Baltimore & Ohio Chicago Terminal Railroad Company in 1931 and by the Alton in 1933) are entitled to seniority with their new employers as of the time they began work for their original employer, the B. & O. under the terms of a purported contract dated August 22, 1934; (2) That the decision

rendered against plaintiffs by F. H. Knight, general president of the Brotherhood Railway Carmen of America, acting as an arbitrator, on March 11, 1937, is void; and (3) That all defendants were ordered to prepare and submit to the B. & O. C. T. and Alton Railroads for approval consolidated rosters of carmen employees of said railroads, giving plaintiffs their original B. & O. seniority.

During the period of this controversy there have existed three distinct corporations, each a common carrier by railroad, and each conducting a separate business. These corporations are (1) the Baltimore & Ohio Railroad Company (herein referred to as the B. & O.), a Maryland corporation; (2) The Baltimore & Ohio Chicago Terminal Company (herein referred to as the B. & O. C. T.), an Illinois corporation; and (3) the Alton Railroad Company (herein referred to as the Alton), also an Illinois corporation.

Prior to July 1931, these companies owned and operated separate railroad shops in or near the City of Chicago, the B. & O. shop being located at the South Chicago yard, the B. & O. C. T. shop at East Chicago, Illinois, and the Alton Shop at Glenn, Illinois. In the month of July 1931, the B. & O. decided to, and did discontinue much of the shop work theretofore performed at its South Chicago shop, and secured its performance thereafter by the B. & O. C. T. at its shop in East Chicago.

When this transfer of work was made, certain of the B. & O. employees who had been performing it were transferred to the shops of the B. & O. C. T. They thereupon ceased to be employees of the B. & O. and became employees of the B. & O. C. T., a separate and distinct corporation, and thereafter received their compensation from it. After this transfer was made, a disagreement arose as to the proper positions of these former B. & O. men on the B. & O. C. T. seniority roster. It was finally decided that their names should be placed at the bottom

of the roster below those of all B. & O. C. T. employees, but in the same order among themselves as that which they had occupied on the B. & O. roster from which they were transferred.

In 1933, a further rearrangement of shop work was made which resulted in the further transfer of B. & O. work (then being performed by the B. & O. C. T.), together with certain shop work of the B. & O. C. T., to the Alton shop at Glenn. Certain other transfers of work were made at this time which are not material to our case. As a result of the above, all work has been discontinued at the original B. & O. shop at South Chicago, and the bulk of the shop work of these three companies in the Chicago area is now being performed by the Alton at the Glenn shop.

After this transfer was decided upon, it was also decided by the three companies involved that they would permit certain employees then working on the B. & O. and the B. & O. C. T. properties to transfer to the Alton shops rather than to have the Alton hire entirely new men to perform the services in question. This, however, did not satisfy the transferred employees (the appellees in this action among others), who demanded that they be given places on the Alton seniority roster, corresponding to the dates of their original employment on the B. & O. Otherwise stated, the demand was that the old B. & O. roster be "dovetailed" into the existing Alton roster, i. e., that the oldest man in the service on either roster be given the number one position on a new combined roster, regardless of whether his seniority had been accumulated on the one road or the other, the second oldest man to be given the number two position, etc. Under the arrangement which the appellees proposed, a man employed by the B. & O. on July 1, 1920, would have a higher seniority standing with his new employer, the Alton, than a man employed by the Alton on July 10, 1920, and continuously employed by it since

that date. The original Alton employees objected to this demand.

The representatives of all the employees involved in this controversy met in an effort to agree upon some method of composing their differences. The representatives in question were the officials of three system federations which represented the shop craft employees of the three carriers in question. A system federation, as its name implies, is a federation of all of the craft unions of shop employees whose members are employed on a given railroad system. System federations are organized under and governed by the constitution and by-laws of the Railway Employes' Department of the American Federation of Labor.

Typically, system federations are made up of the representatives of the craft unions whose members are machinists, boiler-makers, blacksmiths, electrical workers, sheet metal workers, and carmen, respectively. Where a system federation is in existence on a given railroad, it is the collective bargaining representative of all the shop craft employees of that railroad and is empowered to speak for them. Conversely, under the constitution and by-laws of the Railway Employes' Department of the American Federation of Labor, no organization representing a single craft of employees has the authority to negotiate a separate agreement with the railroad without the express consent of the president and executive council of the said Railway Employes' Department. System federations of shop craft employees exist and have existed on each of the three carriers involved in this case during all periods material to the case, that on the B. & O. being known as system federation No. 30, that on the Alton being known as system federation No. 29, and that on the B. & O. C. T., being known as system federation No. 130.

After some negotiation regarding this dispute these three systems, on August 22, 1934, entered into a memo-

randum of agreement, which appears to be the principal subject of controversy in this case, which memorandum of agreement provided in part as follows:

". . . Therefore, it is hereby agreed that employees who were directly affected, or who may later be directly affected by the transfer of work, as mentioned in the preceding paragraph, shall have the right to follow their work to the extent of positions created by reason of transfer of work.

"These positions are to be bulletined and the senior applicant shall be assigned.

"It is further agreed that a sub-committee of three members from each of the three groups involved, namely B&OCT, Alton and B&O Railroads, shall be selected by the three system federations for the purpose of determining the number of positions to be allotted to each group, as the result of the transfer of work in the Chicago territory. It shall be necessary that the conclusion unanimously agreed upon by this committee be final.

"After the number of positions that have been allotted to each group is determined they shall be bulletined and filled from that group.

"It is further agreed, after the above procedure has been completed, that in the event an increase in business necessitates an increase in forces at any point in the Chicago territory, senior furloughed men shall be recalled to service and their seniority will commence on the date of work starting at that point. . . ."

After this agreement was signed, the parties conducted a series of conferences for the purpose of determining the number of new jobs which had been created at the Alton shops by virtue of the transfer of work and the number of B. & O. and B. & O. C. T. employees who should be assigned to these jobs. The other crafts were able to reach an agreement on these points, but the representatives of the carmen were unable to agree, and have been unable to do so to this day. The organizations which had reached an agreement on the

point notified the Alton Railroad of that fact and proposed that seniority rosters be prepared accordingly. The carrier agreed to this arrangement and the controversy was settled as to all crafts except the carmen.

As the carmen's dispute was still unsettled, it was agreed to submit the same to arbitration, Mr. F. H. Knight, president of the Brotherhood Railway Carmen of America, being selected as the arbitrator. The written submission is before the court as an exhibit. Thereafter, Mr. Knight rendered his decision, which appellees have refused to accept on the ground that it was not responsive to the submission. Thereafter this action was filed.

Plaintiffs, in their brief, suggest, in addition to the statements of fact made by defendants, that this is a representative suit brought in behalf of former employees in the car department of the B. & O. Railroad Company; that by virtue of certain consolidations first in 1931, between the B. & O. and B. & O. C. T. and again in 1933 with the Alton, some of the plaintiffs found their work transferred to the newly enlarged Alton shops at Glenn; and that, accordingly, the plaintiffs are for the moment employees of the Alton and the B&OCT and not only of the Alton as stated by appellants. Plaintiffs state, also, that the decree entered in the court below provided—in addition to defendants' summary thereof—that plaintiffs were entitled to follow their work and retain their home road seniority in accordance with the provisions of the August 22, 1934 agreement which was held a valid and binding contract; and that the decree contained one further provision which enjoined the defendants from preventing the plaintiffs from bidding on jobs with the new employers, i. e., in determining the particular work of an individual in accordance with the consolidated rosters and the prevailing custom.

Plaintiffs' theory of the case is that a binding contract clearly expressing the purposes and intentions of the parties, reached after a thorough consideration of all

factors, accepted and performed as intended by five out of the six groups bound thereby, will not be permitted to remain inoperative as to the sixth group because of the obstinacy of some of the parties thereto and thus bring irreparable loss, damage and injury and gross injustice to a large number of persons; and that a court of equity will compel performance by those guilty of breach of faith, and enjoin them from fraudulently continuing to obstruct and prevent the enjoyment of proper legal rights which are the subject matter of the contract.

One of the questions raised and urged by defendants is that seniority rights created by contract between an employer and the representatives of employees, do not follow an employee through a change of employers in the absence of a contract to that effect executed between the new employer and his employees. Plaintiffs had held seniority rights in connection with their employment on the B. & O. as of the date of the beginning of that employment, but it is the contention of defendants that although such rights may exist as between one employer and his employees, they cannot, in the absence of specific agreement, follow the employee through a change of employers and confer upon him rights against his new employer and fellow workers based upon his date of employment with the former one. This conclusion follows inevitably—it is urged—from the legal nature of seniority rights; and further that such rights are necessarily contractual in origin. The case of *Ryan v. New York Cent. R. Co.*, 267 Mich. 202, 255 N. W. 365, is cited and quoted from as follows; ". . . He (the employee) has no inherent right to seniority in service, nor did such right arise out of his employment by the railroad company except as provided for in the contracts entered into and the rules adopted by the company relating thereto. . . ." And further, in *Donovan v. Travers*, 285 Mass. 167, 188 N. E. 705, it is said; ". . . Although a right of seniority such as is here asserted is undoubtedly a valuable property, it arises only

from agreement. . . .'' And in *Boucher v. Godfrey,* 119 Conn. 622, 178 At. 655, the court said; ''If such rights of seniority existed in favor of the plaintiffs, it must be by virtue of some contract between them and the company, either express or implied.'' Also cited, is the case of *Hartley v. Brotherhood of Railway & Steamship Clerks,* 283 Mich. 201. So that, being contract rights, the employee's rights of seniority are effective only to the extent provided in the contract which creates them and against the parties bound by that contract. And we are in agreement with the suggestion that, thus, it follows that such rights, although granted by an employer to its employees, cannot automatically follow the employee to the service of another employer or be applicable against persons already in the employ of such second employer. This result follows, unless the parties by agreement make specific provision for the retention of his seniority standing by an employee under such circumstances.

From the facts of this case, we find that the B. & O. at all times pertinent to this question had an agreement with its shop craft employees represented by system federation No. 30, which provided for seniority rights among the employees covered thereby. Similar agreements have been in effect on the B. & O. C. T. and the Alton, each negotiated between the individual carrier and the representative of its employees. None of these agreements contained any provision to the effect that an employee shifting employers was to carry with him his accumulated seniority. To the contrary, each provided that, when an employee transferred from one shop to another, even on the same road, he would lose his seniority, and his seniority at the new place of employment would begin at the time of his employment at that point. This is what is termed ''point seniority.'' It would appear that the plaintiffs can find no support for their position, in claiming to have acquired seniority rights on the Alton effective as of the date of their first

employment on the B. & O., in any of the collective agreements which were in effect at the time when they were transferred to the Alton shop.

In the absence of any showing of any contract right to seniority in the Alton shop growing out of any agreement with that company, the plaintiffs rely on another and different sort of agreement—the memorandum of agreement of August 22, 1934. This instrument, plaintiffs insist, constitutes a complete contract vesting in them certain legal rights and their action is essentially one seeking specific performance of this alleged contract. Defendants however, contend that this memorandum was not a statement of complete agreement between the parties but was only a stage in a long series of negotiations which were designed to bring about an adjustment of the controversy then pending between the parties; and further that these negotiations broke down without final agreement being reached. Of course, a court of equity may not order the specific performance of an incomplete contract. Before specific performance can be had it must appear that the provisions of the contract are complete and binding on all parties. The trial court, in its decree, upheld the contention of plaintiffs that the contract of August 22, 1934, constituted a complete agreement vesting in plaintiffs certain rights. It appears from the decree that was entered, as follows;

". . . Be it further ordered and directed that the defendants prepare and submit for approval to the B & O C T and to the Chicago & Alton railroads consolidated rosters of all parties to this suit working or entitled to work in the car departments of said employers, dovetailing the names of the plaintiffs, giving them their home road seniority as of the date of the first transfers with the names of the defendants with their home road seniority in the respective places of employment; and that the defendants be and they are hereby enjoined from preventing the B & O men transferred in 1931 from bidding on jobs in accordance with the custom prevail-

ing so long as they bid in accordance with the consolidated roster; and

"Be it further ordered and directed that said consolidated roster be prepared and so submitted within thirty (30) days from the date of the entry of this decree, and this Court shall retain jurisdiction of the subject matter and parties of this suit to effectuate the terms of his decree. . . ."

When we come to consider the contract as the subject matter of this complaint for specific performance, we find that it is not a complete contract. Inasmuch as seniority rights must be effective against the employer if they are to be effective at all, he must be a party to any contractual arrangement which creates or alters them. The Alton railroad has accorded seniority rights to its employees by its general collective bargaining agreement with system federation No. 29, portions of which are copied into the joint exhibit stipulation. That agreement provides that the seniority of any worker shall be computed from the date of his last employment. The memorandum of August 22, 1934, proposes an arrangement which departs from the basic agreement by providing that B. & O. and B. & O. C. T. employees shall have seniority dates with the Alton other than those of their employment with that company. It is contended, with considerable force, that for such an agreement to be effective to establish legal seniority rights in the appellees or anyone else, it must first be assented to by the Alton. The trial court apparently recognized this situation, for it did not order the defendants to make a contract or to abide by a contract which in itself was deemed to provide seniority rights for the appellees but merely ordered them to submit a proposal to the Alton. And, even if the memorandum in question could be considered as a valid and complete contract, it is at most a contract between certain parties to make an offer to another party, an offer which may or may not be accepted. Without such acceptance, the plaintiffs would

not be benefited. There is no evidence in the record indicating the attitude of the Alton toward such a proposal if made and accordingly, there is nothing to show that, if the proposal required by the court were made, it would ever be accepted or the plaintiffs would ever acquire any rights thereunder. The rule, of course, is familiar that, in connection with specific performance of contracts, equity will not use its broad and unique powers to do a vain thing. It will not order a course of conduct which may prove nugatory or without benefit to the persons seeking relief. We are of the opinion that the memorandum of agreement as incorporated in this record was not complete. The trial court by its decree merely directs that a proposal be submitted to the Alton Railroad for its approval; and, of course, as to whether or not it will be approved and accepted is a matter which will be taken care of in the future.

The plaintiffs in their brief say in reply that seniority rights are property rights and may properly be the subject of an agreement between employees or their representatives. As authority for the proposition that employees have the right to contract among themselves about their seniority rights, the case of *Polanskey v. Monongahela Ry. Co.*, 342 Pa. 188, 19 A. (2d) 377, is cited. This recent case by the Supreme Court of Pennsylvania arose because in 1927 the Monongahela Railway took over a portion of the line of the Pennsylvania Railroad Company, whereupon plaintiffs employed by that company became defendant's employees. In adjusting conflicting seniority rights of plaintiffs and the other employees of defendant, an agreement was made between the chairman of the General Grievance Committees representing the Order of Railway Conductors and the Brotherhood of Railroad Trainmen, providing, "in the words of the bill, that 'for the purpose of seniority of employees' the transferred branch 'should be treated as an individual railroad unit and that the plaintiffs herein should have seniority over

any other employees of the Monongahela Railway Company, insofar as said Chartiers Southern Branch was concerned.' '' In 1930, the defendant company constructed an extension to the transferred branch. For about nine years thereafter the extension, for seniority purposes, was treated as part of the branch originally transferred, and plaintiffs enjoyed the preferential rights claimed under the agreement. Later, however, in 1939 as a result of an election in the Brotherhood of Railway Trainmen there was a change in the recognized bargaining agent for the employees and this new agent requested the employer to make a change in the prior agreement. The employer did so, replacing three of the plaintiffs and thus depriving those plaintiffs of their prior seniority which they had enjoyed for nine years. The plaintiffs brought an injunction suit against the employer, asking for a decree to restrain the employer from depriving the plaintiffs of their prior seniority rights under the agreement. The decree was refused and the court affirmed the decree on the ground that the employer not being a party to the agreement between the employees it could not be enjoined.

Plaintiffs contend that the contract of August 22, 1934 itself refutes the claim of defendants that the contract is too indefinite and uncertain to permit enforcement by a decree of specific performance; that it is easily understood what was meant by the phrase, ''have the right to follow their work and retain the same seniority'' as set forth in the contract; and that neither can it be successfully advanced that the necessity for reaching an agreement was uncertain because the agreement itself refers to the three different railroads and the two consolidations as being the cause for confusion and uncertainty. But we cannot quite agree with plaintiffs suggestion. Here, the decree directed that the defendants should prepare and submit for approval to the B. & O. C. T. and to the Chicago & Alton Railroads consolidated rosters of all parties to this suit working or entitled to

work in the car departments of said employers, dovetailing the names of the plaintiffs, giving them their home road seniority as of the date of the first transfers with the names of the defendants with their home road seniority in their respective places of employment, and that the defendants be enjoined from preventing the B. & O. men transferred in 1931 from bidding on jobs in accordance with the custom prevailing so long as they bid in accordance with the consolidated roster. As we have indicated, the conclusion necessarily follows that something remains to be done so as to make the contract enforcible, and that is what the court attempts to do by inserting the provisions of the decree just mentioned. To complete the uncertainty of this so-called contract, it must be noted that the representatives of the carmen were unable to agree and did not agree to the provisions as provided for by the committee that was taking up the question for determination. The contract as to the carmen, therefore, is still in dispute, and their refusal to agree to the provisions as provided for is still the subject of consideration.

Having reached the conclusion that the memorandum of agreement is not a complete contract, it is therefore necessary to consider the law that is applicable to the questions before us. Among the authorities cited by defendants, attention is called to the Restatement of the Law of Contracts, vol. 2, page 673, where the following language appears;

"If the uncertainty is so great as to prevent the giving of any legal remedy, direct or indirect, there is no contract. But there may be cases in which it is just to refuse the remedy of specific performance on the ground of uncertainty, even though it is not unjust to give a judgment for damages or restitution." Then again, the conclusion of the commentator in an annotation on this subject in 65 A. L. R. 102, is referred to, as follows:

"Courts of law will grant relief in damages for the breach of many agreements which would not be regarded

in equity as sufficiently definite and certain to warrant a decree for their specific performance. In this respect a greater degree of certainty is required in the terms of a contract which is to be specifically enforced in equity than is necessary in one which is to be the basis of an action at law for damages, since an action at law is founded on mere nonperformance by the defendant, and this negative act may often be established without determining all the terms of the contract with exactness. On the other hand, a suit in equity is wholly an affirmative proceeding, its object being to procure a performance by the defendant specifically, and this requires a clear and precise understanding of the terms of the contract, for they must be clear and definite before the performance thereof can be decreed.'' Our attention is also called to the case of *Westphal v. Buenger,* 324 Ill. 77, where the court was asked to specifically enforce a written agreement involving real estate which was not complete in its terms. The court there said that ''An agreement in writing which does not purport to give an absolute right without further negotiation thereon, cannot be specifically enforced.'' When we come to consider the memorandum before us, the court is not in a position to enforce the terms of the contract, which is not an affirmative one, the object of this proceeding being, of course, to procure a performance of the action specifically. This requires—as stated in the above annotation in 65 A.L.R. 102—a clear and precise understanding of the terms of the contract, for they must be clear and definite before the performance thereof can be decreed. In our opinion the contract was not a complete one, being such that it was necessary for the court to direct that the defendants should prepare and submit for approval to the B. & O. C. T. and to the Chicago & Alton Railroads consolidated rosters of all parties to this suit working or entitled to work in the car departments of said employers. The suggestion of the trial court by this provision of the decree being that

the B. & O. C. T. and the Alton Railroads approve the proposition after its preparation and submission to them, it is clear that the question of the enforcement of the contract depends on the further act of the employers. As we have already said, the Chicago & Alton has not approved of any offer suggested, and the question is whether said company will accept such offer when submitted to it. Therefore, the contract is not complete, and it is a well-known rule that equity will not enter a decree of specific performance to bring about a further agreement which the parties might have reached. The contract of which specific performance is asked must be complete and capable of enforcement without any further suggestions or agreement to make it complete.

Having considered the questions called to our attention, we are of the opinion that the court erred in its decree, for the reasons stated in this opinion, and the decree will therefore be reversed and the cause remanded with directions to dismiss the complaint for want of equity.

*Decree reversed and cause remanded with directions.*

BURKE, P. J., and KILEY, J., concur.