WAYNE V. BROWN AND STROUT REALTY, INC. v. W. E. FULFORD, JR.
(ROBERT W. KAYLOR, ADMINISTRATOR, C.T.A.)

No. 130PA83

(Filed 5 June 1984)

1. **Brokers and Factors § 1— "indirect cause" of sale language in contract providing for commission—significance of**

    Although parties to a Real Estate Agent's Contract may include language providing for a commission if the efforts of the broker or agent prove to be an "indirect cause" of the sale, and although the parties by so providing would be contracting for recovery outside the general rules dealing with real estate contracts, such language represents a departure from the standard language of a Non-Exclusive Real Estate Agent's Contract, and under certain circumstances, such language might prove significant. However, where the language in the contract between plaintiff and defendant stated that defendant "reserve[s] the right to sell the property to a buyer secured by myself or through another agent and in such case no commission or charge shall be due you, provided such sale or transfer is not made directly or *indirectly* to or through your [Strout Realty, Inc.] prospect," and where this language was interpreted to provide that plaintiffs would be entitled to a commission if the buyer, *even one procured by the defendant-seller or another agent*, was plaintiffs' prospect, under the facts of the case, the Court did not agree with the conclusion reached by the Court of Appeals that the "indirect" language in the agreement was significant since plaintiffs' recovery had to be based on the theory that they would be the procuring cause of the sale.

2. **Brokers and Factors § 6.1— triable issue as to whether plaintiffs procuring cause of sale of property**

    The evidence in an action for a real estate commission tended to show that a Mr. Domnick was interested in the subject property prior to 18 March

1978 when the listing agreement between plaintiffs and defendant was allegedly entered into; however, initial negotiations with the then owner Wachovia ceased in the later part of 1977; Domnick learned that defendant was interested in the property in late 1977 or early 1978; however, he did not know that defendant had an option to purchase the property until the 3 April 1978 meeting when he was so informed by plaintiffs; neither Domnick nor his partner, Dion, met defendant on 3 April 1978; both men were introduced to defendant for the first time at a meeting on 16 April 1978 arranged by plaintiff Brown, where the parties discussed the potential sale of the property and ways to finance the purchase; and the sale was eventually made to a corporation owned by Domnick and Dion. Based on these facts, plaintiffs met their burden of raising a genuine issue of material fact as to whether plaintiff Brown's efforts in arranging either of the April 1978 meetings constituted "the initiating act which [was] the procuring cause of the sale ultimately made."

APPEAL by defendant[1] from a decision of the Court of Appeals, 60 N.C. App. 499, 299 S.E. 2d 272 (1983), reversing summary judgment granted by *Preston, J.,* entered 22 September 1981 in Superior Court, WAKE County. Following the denial of defendant's petition for discretionary review, we allowed defendant's petition for reconsideration on 6 July 1983. Argued in the Supreme Court on 4 October 1983.

*David R. Cockman, for plaintiff-appellee.*

*Everett & Cheatham, by C. W. Everett, Sr. and Robert W. Kaylor, for defendant-appellant.*

FRYE, Justice.

This lawsuit evolves from an agreement entered into by plaintiff Strout Realty and the defendant whereby Strout Realty agreed to list and attempt to sell the Belvedere Plantation near Wilmington, North Carolina. In the complaint, plaintiffs Strout Realty and its agent Brown, a licensed real estate broker, alleged that due to their efforts the property in question was sold to United States Development Corporation for $1,900,000.00 thereby entitling plaintiffs to a commission of $190,000.00 or ten percent of the purchase price. The trial judge granted defendant's motion for summary judgment. The Court of Appeals reversed. For the

1. W. E. Fulford, Jr., died on 17 January 1984. Pursuant to Rule 38 of the North Carolina Rules of Appellate Procedure, substitution of parties was allowed 5 June 1984.

reasons stated herein, we modify and affirm the decision of the Court of Appeals.

The record discloses the following pertinent facts: Prior to 1978 the Belvedere Plantation was owned by Wachovia Mortgage Company. Sometime in the last quarter of 1976, a real estate investor and developer, David S. Wilson, contacted Charles M. Dahlgren, Jr., the Vice-President of Wachovia Mortgage Company, to inquire about the possible purchase of the Belvedere Plantation. The negotiations continued for several months, during which time Mr. Dahlgren was also contacted by Terrence Domnick, Wilson's partner at the time. In researching the background of Mr. Wilson, Mr. Dahlgren learned that he and Mr. Domnick were developing a large tract of land outside Clarksville, Virginia. Mr. Dahlgren concluded that Wilson and Domnick were considering a possible joint purchase of the Belvedere Plantation at that time. During the third quarter of 1977, negotiations ceased.

On 21 October 1977, Wachovia Mortgage Company entered into an option/purchase agreement with the defendant, Dr. William E. Fulford, Jr. During the term of the option, Irvin A. Staton, a representative of the plaintiff, Strout Realty, repeatedly asked for an open real estate listing on the Belvedere property. While there is some question as to whether a valid listing agreement was ever signed, we will assume, for purposes of this opinion, that the listing agreement included in the Record does in fact represent the agreement between the parties.[2]

In late 1977 or early 1978 Terrence Domnick learned from officials at Wachovia that the defendant was attempting to purchase the Belvedere Plantation. On 3 April 1978, as a result of the

---

2. In paragraph four of their complaint, plaintiffs alleged that "on or about 18 March 1978, plaintiff Strout Realty, Inc. and the defendant entered into a listing agreement whereby plaintiffs would list and attempt to sell the 'Belvedere Plantation. . . .'" With respect to this allegation, defendant answered that "it is admitted that the defendant executed the paper writing attached . . . except as admitted, the remaining allegations of paragraph four of the complaint are denied." The Record, however, discloses that when Mr. Staton visited the defendant for the purpose of obtaining a signed listing agreement on the property, he partially filled out a paper writing which he later discovered was never signed. In early 1979, when the defendant informed Mr. Staton of the impending sale of the property and asked if the parties had ever entered into a listing agreement, Mr. Staton believed that they had. At that time, however, Mr. Staton was unable to locate the partially completed agreement. He did find a form signed in blank with an unrelated price figure

initiative of Wayne V. Brown, a new associate at Strout Realty, a meeting took place in Raleigh between Brown, Domnick and David Dion, Domnick's partner. Brown discussed several properties with Domnick and Dion, and it was at this meeting that Domnick first learned of the defendant's option to purchase the Belvedere Plantation.

On 16 April 1978 a second meeting was held, attended by Brown, Staton, Dr. Fulford, Domnick and Dion. The parties discussed the sale and ways to finance the purchase of the Belvedere Plantation.

On 26 May 1978, Wachovia informed Dr. Fulford by letter that, pursuant to the terms of the option agreement, it would tender a fully executed deed to the subject property on 31 May 1978, in exchange for $1,185,000 representing the balance of the purchase price. Unable to meet this demand, Dr. Fulford enlisted the help of Mr. B. L. Lang. An agreement was reached between Dr. Fulford and Mr. Lang whereby the property would be purchased in Lang's name and, upon the sale of the property, each of them would be reimbursed for expenses and the profits would be shared. On 2 June 1978, a deed to the Belvedere Plantation was delivered to Mr. Lang and was recorded on that date.

Wayne Brown terminated his relationship with Strout Realty on 30 May 1978 and on 26 June 1978 he executed a thirty day exclusive listing agreement with the defendant for the sale of the Belvedere Plantation.

Ultimately, on 9 April 1979, as the result of negotiations between Lang, Dr. Fulford and Domnick, Dr. Fulford and Terrence Domnick, who was acting on behalf of United States Development Corporation, entered into an agreement for the sale of the Belvedere Plantation for a purchase price of $1,900,000.

Based on the above stated facts received by the court in the form of pleadings, depositions, interrogatories, affidavits, and ex-

which he then completed, concluding that it was intended to be the Belvedere agreement. It was not until July of 1980 that Mr. Staton found the form he had partially filled out on the Belvedere Plantation. It was unsigned. Mr. Staton disclosed this information by affidavit on 19 August 1981. On 31 August 1981, defendant moved to amend his answer (presumably that portion relating to the execution of the agreement). This motion was denied.

hibits, the trial court granted defendant's motion for summary judgment.

The Court of Appeals reversed, finding as significant the following language in the listing agreement purportedly entered into by Strout Realty and the defendant: "I [Fulford] reserve the right to sell the property to a buyer procured by myself or through another agent and in such case no commission or other charge shall be due you, provided such sale or transfer is not made directly or *indirectly* to or through your [Strout Realty, Inc.] prospect." (Emphasis added.) Based on this language, the Court of Appeals concluded that "even if plaintiffs were only an indirect cause of the sale, they would be entitled to their commission under the terms of the contract. According to plaintiff Brown's affidavit, he arranged the first meeting between Fulford and the eventual buyers of the property, which is some evidence that plaintiffs were at least an indirect cause of the sale." 60 N.C. App. at 504, 299 S.E. 2d at 275.

[1] We first note that parties to a Real Estate Agent's Contract may include language providing for a commission if the efforts of the broker or agent prove to be an "indirect cause" of the sale. By so providing, the parties would, in effect, be contracting for recovery outside our general rules as enunciated in *Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 162 S.E. 2d 486 (1968). Furthermore, we agree that the language in this listing agreement represents a departure from the standard language of a Non-Exclusive Real Estate Agent's Contract, and that under certain circumstances such language might, indeed, prove significant. Essentially, we interpret the language of the agreement to provide that plaintiffs would be entitled to a commission if the buyer, *even one procured by the defendant-seller or another agent*, was plaintiffs' prospect.

We do not agree, however, that the facts of this case warrant the conclusion reached by the Court of Appeals, that the "indirect" language in the agreement is significant. Plaintiffs' recovery must be based on the theory that they were the procuring cause of the sale. The essential question involved in the case before us is whether anyone can "procure a purchaser" who is already familiar with the property in question and who has previously tried to purchase that same property from a prior owner.

Thus, plaintiffs' recovery will be determined by the application of the general rules governing the right of a real estate broker to recover a commission for his services. *See Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 162 S.E. 2d 486.

**[2]** The sole issue before us then is whether the trial court erred in granting defendant's motion for summary judgment.

Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."

The law is succinctly stated in *Bone International, Inc. v. Brooks*, 304 N.C. 371, 375, 283 S.E. 2d 518, 520 (1981):

A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim. *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 251 S.E. 2d 419 (1979); *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 209 S.E. 2d 795 (1974). Generally this means that on "undisputed aspects of the opposing evidential forecast," where there is no genuine issue of fact, the moving party is entitled to judgment as a matter of law. 2 McIntosh, *North Carolina Practice and Procedure* § 1660.5, at 73 (2d ed. Supp. 1970). If the moving party meets this burden, the non-moving party must in turn either show that a genuine issue of material fact exists for trial or must provide an excuse for not doing so. *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. at 470, 251 S.E. 2d at 421-22; *Zimmerman v. Hogg & Allen*, 286 N.C. at 29, 209 S.E. 2d at 798. If the moving party fails to meet his burden, summary judgment is improper regardless of whether the opponent responds. 2 McIntosh, *supra.* The goal of this procedural device is to allow penetration of an unfounded claim or defense before trial. *Id.* Thus, if there is any question as to the credibility of an affiant in a summary judgment motion or if there is a question which can be resolved only by the weight

of the evidence, summary judgment should be denied. *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. at 470, 251 S.E. 2d at 422.

In the present case, the defendant, as the moving party, must prove that an essential element of plaintiffs' claim is nonexistent or show that a forecast of plaintiffs' evidence indicates an inability to prove facts giving rise at trial to all essential elements of their claim. In short, the defendant would be entitled to summary judgment if the facts irrefutably disclose that plaintiffs were not the procuring cause of the sale. *Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 162 S.E. 2d 486.

In *Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, we set forth the principles of law applicable to the right of a real estate broker to recover a commission for his services:

> Ordinarily, a broker with whom an owner's property is listed for sale becomes entitled to his commission whenever he procures a party who actually contracts for the purchase of the property at a price acceptable to the owner. *Cromartie v. Colby*, 250 N.C. 224, 108 S.E. 2d 228; *Martin v. Holly*, 104 N.C. 36, 10 S.E. 83. If any act of the broker in pursuance of his authority to find a purchaser is the initiating act which is the procuring cause of a sale ultimately made by the owner, the owner must pay the commsision [sic] provided the case is not taken out of the rule by the contract of employment. *Trust Co. v. Goode*, 164 N.C. 19, 80 S.E. 62. The broker is the procuring cause if the sale is the direct and proximate result of his efforts or services. The term *procuring cause* refers to "a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms." 12 C.J.S. *Brokers* § 91, p. 209 (1938). *Accord*, 12 Am. Jur. 2d *Brokers* § 190 (1964).

*Id.* at 250-51, 162 S.E. 2d at 491.

In the instant case, the evidence, for the most part undisputed, indicates the following: Terrence Domnick was in-

terested in the subject property prior to 18 March 1978 when the listing agreement was allegedly entered into. However, initial negotiations with the then owner Wachovia ceased in the latter part of 1977. Domnick learned that defendant was interested in the property in late 1977 or early 1978. However, he did not know that defendant had an option to purchase the property until the 3 April 1978 meeting when he was so informed by plaintiffs. Neither Domnick nor his partner, Dion, met defendant on 3 April 1978. Both men were introduced to Dr. Fulford for the first time at a meeting on 16 April 1978 arranged by Mr. Brown, where the parties discussed the potential sale of the property and ways to finance the purchase. The sale was eventually made to a corporation owned by Domnick and Dion.

Based on these facts, we believe that plaintiffs have met their burden of raising a genuine issue of material fact as to whether Brown's efforts in arranging either of the April 1978 meetings constituted "the initiating act which [was] the procuring cause of the sale ultimately made." *Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. at 250, 162 S.E. 2d at 491.

While it is true that during 1976 Domnick had, on his own initiative, engaged in negotiations for the purchase of the property, those negotiations involved parties entirely different from those parties with whom Domnick negotiated for the final sale. Included in the original negotiations were David A. Wilson, then Domnick's partner, Charles Dahlgren, Vice-President of Wachovia Bank, and later Domnick himself. The 16 April 1978 meeting arranged by Brown included, in addition to representatives from plaintiff Realty Company, Domnick, Dion, who was then Domnick's partner, and the defendant. Final negotiations also included Lang. It is likely that the substance and terms of the earlier negotiations differed from the later ones. Furthermore, of great significance is the fact that in 1977, well before Brown's initiative in 1978, negotiations between Domnick and Wachovia had ceased.

In his affidavit, Domnick states that neither Wayne Brown nor Strout Realty contacted him "for the purpose of buying Belvedere Plantation from anyone," since he had been "interested in Belvedere Plantation on [his] own for some time prior to [his] meeting with William E. Fulford and Ben Lang." For the reasons stated above, we do not consider Domnick's prior interest in the

property determinative of the issue. Rather, if the jury should find that the plaintiffs, pursuant to their authority to find a purchaser for the Belvedere Plantation, arranged meetings with the defendant and that those meetings, or either of them, constituted the initiating act that set in motion a series of events which, without break in their continuity, resulted in the eventual sale of the property to United States Development Corporation, plaintiffs are entitled to their commission. *Id.*

We agree with the decision of the Court of Appeals that there is an issue of fact concerning Dr. Fulford's interest in the property at the time of the sale. In this respect, the Court of Appeals wrote:

> Regarding Fulford's interest in the property, it is indisputed that he had paid $165,000.00 for his option. When he assigned the option to Lang, and Lang purchased the property, Fulford paid an additional $400,000.00 and Lang paid $785,000.00. Thus, although title was in Lang's name, Fulford had invested $565,000.00. Lang obviously thought Fulford had an interest in the property. In his deposition, he said:
>
>> A deed was made from Wachovia Mortgage Company to me dated the 20th day of March, 1978. . . . We bought the property. . . . When I am talking about "we" I mean Dr. Fulford and myself. We had to get it done before 5:00. Dr. Fulford and I bought the property but it was put in my name. . . . I would get my expenses back and he would get his costs back and we would split the profit.
>
> Lang said that he offered the property to Fulford for $1,200,000.00 because Fulford already "owned part of the property." He also said "Dr. Fulford had a vested interest in this property. . . ."
>
> Although Lang held legal title, Fulford had an equitable interest. For example, had he needed to enforce his interest, it had all the factors required for a purchase money resulting trust which is defined as follows: When one person pays for land but title is taken in another, a resulting trust commensurate with his interest arises in favor of the one who furnished the consideration. *Cline v. Cline*, 297 N.C. 336, 255

S.E. 2d 399 (1979). Although Fulford strenuously argues that he never had an interest in the property, other than an option, clearly there is evidence from which the jury could find that he had an interest in the property.

60 N.C. App. at 503, 299 S.E. 2d at 274-75.

Finally, defendant contends that should this Court determine that there are sufficient issues of material fact to withstand summary judgment as against the corporate plaintiff, the uncontradicted record evidence compels that summary judgment should be entered against the plaintiff Brown. The Court of Appeals did not address this question and there is nothing of record to indicate that the question was raised or argued before the Court of Appeals. Therefore, the question is not properly before us. N.C.R.A.P., Rule 16.

The decision of the Court of Appeals is

Modified and affirmed.